## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BELLA WILSON, individually, and as          :
Administrator and sole heir of the Estate   :
of Damian Wilson,                           :
                                            :          CIVIL ACTION
                 Plaintiff,                 :
                                            :
           v.                               :
                                            :          NO.  14-2498
BANK OF AMERICA, N.A.,                       :
                                            :
                 Defendant,                 :


## MEMORANDUM

BUCKWALTER, S.J.                                        September 24, 2014


Currently pending before the Court is a Motion to Dismiss filed by Defendant Bank of

America, N.A. ("BOA" or "Defendant").  For the following reasons, the Motion is granted in part

and denied in part.

## I.      FACTUAL BACKGROUND

According to the facts set forth in the Complaint, Plaintiff Bella Wilson ("Plaintiff" or

"Wilson") is the sole owner of a two-story row house at 6014 Ogontz Avenue, Philadelphia,

Pennsylvania (the "Property").  (Compl. ¶ 8.)  The mortgage on the Property (the "Mortgage") is

owned and serviced by Defendant BOA.  (Id. ¶ 9.)  The Mortgage was originally made to

Plaintiff's deceased son, Damian Wilson, who purchased the house in December 2006 with funds

from a BOA mortgage loan.  (Id. ¶ 10.)  Damian Wilson died on September 21, 2007, and left

Plaintiff as his sole heir.  (Id. ¶¶ 10–11.)  Plaintiff made several mortgage payments to BOA until

receiving assurances from Damian's friends, who had been living in the house with him just prior to his death, that they would maintain the payments.  (Id. ¶¶ 11, 13.)  Although Plaintiff attempted to confirm with BOA that the mortgage was being maintained, BOA would not provide account information to her.  (Id. ¶ 14.)

On April 8, 2008, Plaintiff was granted Letters of Administration by the Register of Wills for Philadelphia County, thereby making her the formal legal representative for Damian's estate.  (Id. ¶ 15.)  Thereafter, BOA changed the name of the account holder for the Mortgage to "Estate of Damian Wilson."  (Id. ¶ 16.)  The Mortgage is presently "underwater," meaning that the debt is in excess of the value of the Property.  (Id. ¶ 17.)  In April 2009, Plaintiff discovered that the people living in the house had moved out and damaged the property.  (Id. ¶ 18.)  She contacted BOA and indicated that she wanted to take control of the Property and make repairs, provided that BOA would work with her in bringing the mortgage account current.  (Id.)  The BOA representative mentioned the possibility of a "loan modification."  (Id.)

These events coincided with the economic collapse that occurred in 2008 and the resulting response by the federal government, which included the enactment of the Home Affordable Modification Program ("HAMP") on February 18, 2009.  (Id. ¶¶ 19–20.)  HAMP is funded by the federal government, primarily with funds from the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  (Id. ¶ 23.)  Because BOA accepted $25 billion in TARP funds and additional loan guarantees, it was required to participate in HAMP for the mortgage loans where it functioned as the mortgage "servicer," and it entered into a written HAMP participation agreement with the Treasury Department on April 17, 2009.  (Id. ¶ 24.)  This participation agreement required BOA, among other things, to implement and operate a HAMP program in

accordance with the program directives issues by Treasury, Fannie Mae and/or Freddie Mac. (Id. ¶ 25.)  Under HAMP, qualified homeowners who are delinquent or otherwise financially distressed are eligible for a permanent modification of their mortgage so as to lower their monthly mortgage payment to affordable levels, and servicers must structure a hypothetical modified loan in accordance with a sequence called the "waterfall."  (Id. ¶ 26.)  The terms of the modified loan are based on the borrower's monthly gross income, applying the waterfall.  (Id. ¶ 27.)  Once the hypothetical loan modification is determined, the servicer applies a "net present value" ("NPV") test which, if passed ("NPV-positive"), qualifies the borrower for the modification.  (Id. ¶ 28.)

HAMP directives define a two-step procedure for determining HAMP eligibility: (1) the participating servicer gathers financial information from the homeowner and, if the homeowner is qualified, offers a three-month Trial Period Plan ("TPP") agreement based on its calculation of the appropriate modified mortgage payment; and (2) if the homeowner completes the required three TPP payments and continues to provide the relevant documentation, the servicer enters into a permanent loan modification agreement with the homeowner.  (Id. ¶ 29.)  HAMP program directives expressly provide for qualifying the surviving heirs of deceased borrowers.  (Id. ¶ 30.)  The program directives also require BOA to evaluate all loans in its servicing portfolios for possible eligibility for HAMP.  (Id. ¶ 31.)

Soon after BOA signed its HAMP participation agreement, it identified the Mortgage at issue as one potentially eligible for a HAMP modification, and, in accordance with BOA's instructions, Plaintiff submitted HAMP-related documentation to BOA.  (Id. ¶ 32.)  The Mortgage was qualified for HAMP in that it was NPV-positive and, by application of the

3

waterfall, the Mortgage could be made current and affordable through a combination of reducing the interest, extending the term, and/or deferring a portion of the principal.  (Id. ¶ 33.) Nonetheless, on May 20, 2009, BOA initiated a foreclosure action against the Property, naming as defendants "the Estate of Damian Wilson" and "Bella Wilson, as Administratrix and Heir." (Id. ¶ 34.)  As part of the foreclosure packet served on her, Plaintiff was encouraged to seek the assistance of a housing counseling agency and to participate in the local state court's Mortgage Foreclosure Diversion Program.  (Id. ¶ 36.)  Shortly thereafter, Plaintiff arranged to meet with a housing counselor, executed a deed to the Property from herself as Administratrix to herself as the sole heir, and remained in contact with BOA.  (Id. ¶ 37.)  After meeting with a housing counselor on June 9, 2009, Plaintiff began the process of becoming qualified for the HAMP loan modification.  (Id. ¶ 38.)

On July 2, 2009, Plaintiff, her counselor, and BOA appeared at a "conciliation conference" under the state court's Foreclosure Diversion Program, at which point BOA acknowledged that the HAMP application was being processed, represented that the loan would be modified if Plaintiff provided proof that the deed naming her as owner had been duly recorded, and entered into a written agreement with Plaintiff to suspend the foreclosure action. (Id. ¶ 39.)  This agreement was submitted to the court and subsequently entered as an order.  (Id.) Thereafter, on July 6, 2009, Plaintiff recorded the deed to the Property from the Estate to herself. (Id. ¶ 40.)

On July 25, 2009, by letter addressed to "the Estate of Damian Wilson" at the Property address, and referencing the Mortgage account number, BOA advised Plaintiff that, "[b]ased on an initial review of your current financial situation, you may be eligible for a loan modification as

part of the federal government's Home Affordable Modification Program to help homeowners." (Id. ¶ 41.)  The letter included the offer of a three-month Home Affordable Modification Trial Period Plan ("TPP Agreement") providing for a "trial period payment" ("TPP") of $636.24 per month commencing September 1, 2009.  (Id.)  The letter further advised Plaintiff that the amount of the TPP was "based on the income information that you previously provided to us," and asked Plaintiff to provide supplemental financial information and a Hardship Affidavit explaining the circumstances of the delinquency.  (Id. ¶ 42.)  It represented that if Plaintiff's additional information confirmed her eligibility for HAMP and she made the three trial payments, "a new loan modification agreement will be sent to you."  (Id.)

With the assistance of her housing counselor, Plaintiff prepared the "hardship affidavit," gathered the requested financial information, and sent these materials and the signed TPP agreement to Defendant.  (Id. ¶ 43.)  Plaintiff mailed to BOA her three TPP payments from September to December 2009.  (Id. ¶ 44.)  Nonetheless, she never received the permanent HAMP modification agreement before the end of her trial period, as promised.  (Id. ¶ 45.)  Plaintiff continued to tender monthly payments in the amount specified in the TPP Agreement while awaiting the arrival of the promised modification agreement.  (Id.)

On March 11, 2010, BOA sent a letter to Plaintiff personally, not as administratrix, thanking her for "sending us your Trial Period Plan agreement and some of the required documentation," but asking for recent pay stubs and bank statements.  (Id. ¶ 46.)  Plaintiff complied with this request.  (Id.)  On May 6, 2010, BOA sent Plaintiff a letter stating that she had been determined not eligible for HAMP because "you did not make all the required Trial Period Plan payments by the end of the trial period."  (Id. ¶ 47.)  Having already made nine payments of

$636.24, Plaintiff sent her tenth payment in June 2010.  (Id. ¶¶ 48–49.)  BOA, however, returned the payment in July stating that the funds paid had not been certified, despite the fact that it had never required certified funds before and had accepted her nine previous personal checks.  (Id. ¶ 49.)  In light of these developments, Plaintiff again sought the assistance of her housing counselor.  (Id. ¶ 50.)  BOA asked for a new set of financial documents, which Plaintiff and her counselor submitted.  (Id. ¶ 51.)

On August 9, 2010, BOA sent Plaintiff a letter entitled "Partial Payment Agreement," which provided for new monthly payments of $700/month.  (Id. ¶ 52.)  She signed and returned the letter with a payment of $700.  (Id.)  That letter did not refer to the HAMP program or explain what happened to either her pre-existing TPP Agreement or the funds she paid pursuant to that agreement.  (Id. ¶ 53.)  Instead, it represented that, on December 1, 2010, BOA would decide, at its sole discretion, whether to modify the loan, or demand resumption of payments or immediate reinstatement of the loan.  (Id.)  Plaintiff complied with the "Partial Payment Agreement" and sent BOA $700 postal money orders beginning in August 2010.  (Id. ¶ 54.)

On November 5, 2010, BOA sent Plaintiff a letter thanking her for "successfully completing your Special Forebearance Plan," and informing her that, as a result, BOA would "review your loan for a modification."  (Id. ¶ 55.)  December 1, 2010—which was the decision date referenced in the "Partial Payment Agreement"—passed without BOA offering a loan modification or making any other payment demands.  (Id. ¶ 56.)  Plaintiff continued to pay $700/month, which BOA accepted from August 2010 though March 2011.  (Id. ¶¶ 56–57.)  In April 2011, Plaintiff tendered a $700 payment, which BOA returned with a note stating only, "The amount remitted does not represent the total due."  (Id. ¶ 58.)  During the period that BOA

was accepting the $700 payments, Plaintiff was in active contact with one of BOA's departments that referred to itself as the "Home Retention Division."  (Id. ¶ 59).  While representatives from this Division initially requested more documents, they suddenly stopped communicating with her, representing that she was "not in the system."  (Id.)  At one point, they referred her to the Assumptions Department, but that Department sent her back to the Home Retention Department, who continued to deny her status as a mortgagor.  (Id. ¶ 59.)

On April 5, 2012, forty-nine states (including Pennsylvania), the District of Columbia, and the federal government entered into consent judgments with BOA and four other mortgage servicers arising out of a national investigation of foreclosure-related misconduct.  (Id. ¶ 60.)  In the National Mortgage Settlement ("NMS"), BOA made financial commitments to modify mortgages over and above what it had already generally committed to under the HAMP program, with special attention to underwater loans like Plaintiff's.  (Id. ¶ 61.)  It also became obligated to change its servicing practices, including (a) notifying all borrowers of available "loss mitigation" alternatives to foreclosure, such as HAMP, before foreclosing; (b) converting all languishing TPP agreements to permanent loan modifications; and (c) restricting any further "dual-track" foreclosure and HAMP processing.  (Id.)  Finally, it agreed to various restrictions on the fees and charges paid on delinquent mortgage accounts.  (Id. ¶ 62.)

Notwithstanding this NMS, BOA entered a default judgment in foreclosure against Plaintiff on May 29, 2012, and scheduled a sheriff's sale.  (Id. ¶ 63.)  It did so without complying with any of its obligations under the NMS.  (Id.)  The default judgment included additional charges in fees, as follows: inspection fees of $581, representing a monthly charge; $2,175 for "legal fees;" and $1,742.66 for "cost of suit and title."  (Id. ¶ 64.)  BOA ultimately stayed the

scheduled sheriff's sale, but continued to schedule subsequent sales, stay those sales, and schedule new sales.  (Id. ¶ 65.)  On July 22, 2013, BOA sent Plaintiff two letters.  In one letter, BOA advised Plaintiff that she would not be considered for a loan modification "under the terms of the settlement" because "you withdrew that request on July 19, 2013."  (Id. ¶ 66.)  In the other one, BOA stated, "We are unable to complete our modification because the person who requested the loan modification is not a borrower on the mortgage loan."  (Id.)  Plaintiff claims that these conflicting letters were erroneous.  (Id. ¶ 67.)

On August 1, 2013, Plaintiff sent BOA the first of four written inquiries ("Inquiry #1") sent pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e). (Id. ¶ 68.)  This inquiry called BOA's attention to the contradictory and erroneous July 22, 2013 letters, asked why her HAMP agreement was not honored and whether BOA would honor it now, and asked what specific loss mitigation alternatives were available to save the house.  (Id. ¶ 68.) BOA sent Plaintiff a "Reinstatement Calculation" on September 19, 2013, that included figures for the fees and charges that were different from the ones listed in the judgment.  (Id. ¶ 69.) BOA represented that the following charges or fees had been added to the account: $521.42 for Inspection Fees, $1,775 for foreclosure attorney fees, and $4,658.07 for Foreclosure Expenses. (Id. ¶ 69.)

On October 1, 2013, Plaintiff sent BOA her Inquiry #2, in which she asked for an explanation and breakdown of the Inspection Fees and the Foreclosure Expenses.  (Id. ¶ 70.)  On October 8, 2013, BOA sent Plaintiff a response to Inquiry #1, which only partially responded to the inquiry and contained material errors about her account, as follows:

- With regard to Plaintiff's request for the reasons her initial HAMP

application and completed payment agreements were not honored, BOA stated that she failed to complete her initial TPP payments, but not specifying what payment had supposedly been missed, and stating erroneously that Plaintiff had declined a second HAMP offer.

• BOA acknowledged that the second July 22, 2013, in which it deemed her not HAMP eligible because she was not the original mortgagor, was sent in error.

• BOA provided no explanation about the so-called "Partial Payment Agreement" BOA gave her in August 2010.

(Id. ¶ 71.) On November 5, 2013, Plaintiff sent BOA Inquiry #3, wherein she disputed missing a TPP payment during the 2009–10 period and requested a copy of the complete account history.

(Id. ¶ 72.) She also asked BOA to review her history, correct her account records, and reconsider her for HAMP. (Id.) BOA sent Plaintiff an account history on December 5, 2013, showing some, but not all of the activity on the account. (Id. ¶ 73.)

On January 15, 2014, Plaintiff sent BOA Inquiry #4, which was divided into two sections. (Id. ¶ 74.) The first part, labeled a "Notice of Error," asserted that the sheriff's sale had been scheduled in error, requested correction of the mishandling of Plaintiff's HAMP application, and sought removal of improper fees and expenses billed by BOA's foreclosure firm. (Id.) The second part, labeled a "Request for Information," sought itemized information and documents, including, among other items, servicing logs maintained by BOA regarding communications between Plaintiff and BOA's representatives; audio files of any of these conversations; and copies of documents received from Plaintiff or her representatives regarding her request for loan modification or other loss mitigation. (Id. ¶ 75.) Plaintiff also requested copies of property inspection reports and "invoices received from the foreclosure firm and paid by Bank of America for fees or costs related to the foreclosure and included in the current balance of my account."

(<u>Id.</u>)

On January 24, 2013, BOA sent Plaintiff a second response letter purportedly responding to Inquiry #3 and Inquiry #4.  (<u>Id.</u> ¶ 76.)  This response:

- Stated that the TPP payment Plaintiff had supposedly missed was the January 2010 payment.

- Stated that the "true reason" for the denial of HAMP was that she was not the original mortgagor, not that she had declined assistance.

- Advised her that she should call BOA's Assumption Department, but warning that "[a]lthough you administer Damian Wilson's estate, that is not the same thing as assuming the Loan and becoming a borrower" and that "the Loan must be contractually current if you wish to qualify for an assumption."

(<u>Id.</u>)  This letter also provided incomplete responses to Inquiry #2 in that it (a) failed to provide any explanation for the property inspection charges, stating only that property inspection charges had been increased to $812; and (b) did not explain why the foreclosure fees and expenses were almost $3,000 more than the previous quote.  (<u>Id.</u> ¶ 77.)

On January 27, 2014, BOA sent additional information to Plaintiff, partially responding to Inquiry #4, but failed to provide most of the specific documents sought, including (a) those pertaining to BOA's consideration of Plaintiff for loan modification or other assistance, including copies of its servicing logs noting communications with Plaintiff and documents submitted by Plaintiff; (b) copies of property inspection reports; and (c) copies of invoices paid by BOA to its foreclosure firm with respect to the Property.  (<u>Id.</u> ¶ 78.)  BOA has continued to schedule, stay, and reschedule sheriff's sales of the Property.  (<u>Id.</u> ¶ 79.)  Presently, the Property is scheduled for sale by the Philadelphia Sheriff on June 3, 2014.  (<u>Id.</u>)  Plaintiff has incurred approximately $44,000 in out-of-pocket expenses related to her efforts to save the Property.

(Id. ¶ 80.)

Plaintiff initiated the present action against Defendant BOA on April 30, 2014.  The Complaint sets forth five causes of action, as follows: (1) violation of RESPA for failing to conduct a "reasonable investigation" in response to Plaintiff's Notice of Error included in Inquiry #4 (id. ¶¶ 81–95); (2) violation of RESPA for failing to properly respond to Plaintiff's Requests for Information (id. ¶¶ 96–105); (3) violation of the Pennsylvania Unfair and Deceptive Practices and Consumer Protection Law ("UTPCPL") (id. ¶¶ 106–114) ; (4) breach of the TPP contract (id. ¶¶ 115–119); and (5) promissory estoppel/detrimental reliance.  (Id. ¶¶ 120–126.)

Defendant filed a Motion to Dismiss the Complaint on June 30, 2014, and Plaintiff responded on July 30, 2014.  Defendant then filed a Reply Brief on August 13, 2014, making this Motion ripe for judicial consideration

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Id. at 678.  Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may

12

be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

Defendant seeks to dismiss the entirety of Plaintiff's Complaint on several grounds: (1) Plaintiff has no standing to bring claims in her individual capacity; (2) Plaintiff's RESPA claims are deficiently pled; (3) Plaintiff's UTPCPL claim fails because there is no private right of action under HAMP; (4) Plaintiff's breach of contract claim fails because it duplicates a private cause of action under HAMP and because there is no HAMP guideline authorizing a permanent modification of a mortgage loan in the name of an estate; and (5) Plaintiff's promissory estoppel/detrimental reliance claim fails because her argument is based on a contract. Plaintiff, in turn, disputes each of these assertions.

### A.    Plaintiff's Claims Brought in Her Individual Capacity

Defendant's first challenge asserts that Plaintiff lacks standing to bring any of her claims—either under RESPA or under state law—in her individual capacity. Upon consideration of the relevant jurisprudence, the Court agrees.

First, as to all of Plaintiff's state law claims (Counts III, IV, and V), it is well-established under Pennsylvania's Survival Act that "[a]ll causes of action, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." 42 Pa. Cons. Stat. § 8302. In turn, "all actions that survive a decedent, must be brought by or against the personal representative of the decedent's estate." Prevish v. Nw. Med. Ctr. Oil City Campus, 692 A.2d 192, 200 (Pa. Super. Ct. 1997). "Proceeds recovered belong to the estate and are available to pay the decedent's debts and distributed to heirs, legatees or distributees as general assets of the estate." Rogan v. Cnty. of Lawrence, Pa., No. Civ.A.12-

13

1375, 2013 WL 3369146, at *7 (W.D. Pa. July 2, 2013).  The heirs may only recover damages recuperated by the estate as beneficiaries of that estate.  Id.

In this case, Plaintiff never assumed the loan in her individual capacity.  The original foreclosure action was brought on May 20, 2009, with Defendant initiating an action against the Property, naming as defendants "the Estate of Damian Wilson" and "Bella Wilson, as Administratrix and Heir."  (Id. ¶ 34.)  The initial offer of a HAMP TPP Agreement was sent to the "Estate of Damian Wilson" and the contract was signed by Plaintiff in her capacity as Administratrix.  (Id. ¶ 41.)  Moreover, the Complaint contains no allegation that Plaintiff ever assumed the Loan on the Property, as opposed to transferring the deed to the Property to her name.  As such, Plaintiff does not have standing to bring suit on state law claims in her own right as an heir to the Property, but she may properly pursue them as personal representative of the Estate.

As to Plaintiff's federal claims, RESPA states that "[w]hoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts . . ." 12 U.S.C. § 2605(f).  Although the statute does not explicitly define "borrower," RESPA applies only to "federally related mortgage loan[s]," 12 U.S.C. § 2602(1), suggesting that a "borrower" would be the named borrower on that loan.  As Plaintiff concedes in her Complaint, "[t]he 'borrower' on the mortgage, within the meaning of 12 U.S.C. § 2605, is 'the Estate of Damian Wilson.'  Plaintiff is the legal representative and sole beneficiary of that estate." (Compl. ¶ 85.)  Although the Complaint indicates that Plaintiff recorded the deed to the Property from the Estate to herself, at no point does the Complaint allege that Plaintiff assumed the loan on the Property, such that she became the "borrower."  As such, the RESPA cause of action

14

belongs only to Plaintiff as Administratrix of the Estate and not to her as an individual heir to the Estate.

Plaintiff's contrary arguments are unavailing.  First, she argues that "[t]here is only one Bella Wilson, not two . . . [and] there is no legal basis for deconstructing the complaint into claims brought by two separate Bella Wilsons."  (Pl.'s Resp. Opp'n Mot. Dismiss 18.)  Plaintiff, however, misunderstands the distinctions between her two legal capacities in this case.  Were Plaintiff merely the heir to the Estate, she could not pursue her claims.  In her legal capacity as the Administratrix of the Estate, however, Plaintiff has standing to bring the enumerated claims.

Second, Plaintiff contends that "[a]s a matter of federal law, when a residential mortgagor dies, a surviving family member who inherits the mortgaged property, takes title and is living in the house must be treated as succeeding borrower on the mortgage loan, not as a stranger that has to apply to assume the mortgage pursuant to the lender's credit standards."  (Pl.'s Resp. Opp'n Mot. Dismiss 18.)  For this proposition, Plaintiff cites to an irrelevant statute—the Garn-St. Germain Act, 12 U.S.C. § 1701j–3(d)(5)—which prohibits a federal savings and loan institution's exercise of a "due-on-sale" clause upon "transfer to a relative resulting from the death of a borrower."  12 U.S.C. § 1701j-3(d)(5).  No "due on sale" clause is involved in this case and Plaintiff has cited no case law showing that principles of this provision have been extended to RESPA.

Third, Plaintiff attempts to assert that the foregoing principle was adopted by the Treasury Department in connection with HAMP and that Defendant was required to evaluate her qualifications for HAMP "as if . . . she was the borrower."  (Pl.'s Resp. Opp'n Mot. Dismiss 19 (quoting Making Home Affordable Handbook for Non-GSE Servicers, Ch. II, § 8.8 (vers. 4.4,

15

3/3/2014).)  She goes on to cite the recently-issued interpretive opinion under the Truth in

Lending Act clarifying that "where a successor-interest (successor) who has previously acquired

title to a dwelling agrees to be added as obligor or substituted for the existing obligor on a

consumer credit transaction secured by that dwelling, . . . such a transaction does not constitute

an assumption."  (Id. at 20 (citing 79 Fed. Reg. 41631-01).)  Plaintiff then recites HAMP

program directives as specifically providing for qualifying the surviving heirs of decease

borrowers, as follows:

> Non-borrowers who inherit or are awarded sole title to a property may be considered
> for HAMP even if the borrower who previously owned the property was not already
> in a TPP.  Such titleholders may be considered for HAMP if they meet all applicable
> eligibility criteria.  In this case, servicers should collect an Initial Package from the
> non-borrower who now owns the property and evaluate the request as if he or she
> was the borrower.

(Compl. ¶ 30 (quoting MH Handbook for Non-GSE Servicers, Ch. II, § 8.8).)

To the extent Plaintiff cites interpretative rulings regarding the Truth in Lending Act,

however, that statute is not at issue and that ruling was not effective until after the filing of the

Complaint in this case.  See 79 Fed. Reg. 41631-01 ("This clarification is effective July 17, 2014

and applicable beginning July 8, 2014.").  Further, to the extent Plaintiff relies on the HAMP

Handbook, the remainder of § 8.8 states that, "The servicer should process the assumption and

loan modification contemporaneously if the titleholder is eligible for HAMP and investor

guidelines **and applicable law permits assumption of the loan**."  HAMP Handbook at Ch. 2, §

8.8, available at www.hmpadmin.com (emphasis added).  As aptly noted by Defendant, Plaintiff

has not alleged or otherwise shown that she was eligible to assume the loan such that she should

be treated as a borrower under HAMP in her individual capacity.

16

Finally, Plaintiff asserts an estoppel argument alleging that over the course of the last five years, Defendant considered her the person responsible for the mortgage obligation when it named her as a defendant in the 2009 foreclosure action, negotiated with her and her housing counselor at the court-supervised conciliation conference on July 2, 2009, entered into an agreement with her to suspend the foreclosure, accepted her HAMP application, and then informed her that she may be eligible for loan modification.  Further, Plaintiff argues that she made the nine TPP payments accepted by Defendant and incurred $44,000 in out-of-pocket expenses in an effort to save her son's property.

Again, this argument fails.  Defendant did not name Plaintiff individually as a defendant in the 2009 foreclosure action; rather, according to the Complaint, it named as defendants "the Estate of Damian Wilson" and "Bella Wilson, as Administratrix and Heir."[1]  (Compl. ¶ 34.)  Moreover, Plaintiff has not alleged that Defendant's negotiation with her at the conciliation conference was done with her in any other capacity than as personal representative of the Estate.  The same holds true with Defendant's acceptance of her HAMP application and its responses to her Qualified Written Requests—Defendant dealt with Plaintiff as Administratrix, not in her personal capacity.  Indeed, the letters attached to Plaintiff's Complaint reflect that Defendant sent letters to the Estate, not to Defendant individually.  Finally, to the extent Plaintiff expended funds in an effort to save her son's property, those funds are recoverable only by the Estate as they are deemed to have been expended by her as Administratrix.

---

[1] Defendant was required to name Plaintiff as heir in the foreclosure action under Pennsylvania Rule of Civil Procedure 1144, which mandates that a plaintiff in foreclosure name as defendants: "(1) the mortgagor; (2) the personal representative, heir or devisee of a deceased mortgagor, if known; and (3) the real owner of the property, or if the real owner is unknown, the grantee in the last recorded deed."  Pa. R. Civ. P. 1144(a).

In sum, Plaintiff has no standing under Pennsylvania law to bring claims against Defendant in her individual capacity.  Moreover, because Plaintiff, individually, was not the borrower on the loan at issue, she has no standing as an individual under RESPA to bring her claims.  Accordingly, all claims in the Complaint alleged by Plaintiff in her individual capacity are dismissed.

### B.     RESPA Claims (Counts I and II)

Defendant next seeks dismissal of the RESPA claims (Counts I and II).  Count I of Plaintiff's Complaint alleges that Defendant violated RESPA by failing to conduct a "reasonable investigation" and provide a written notice in response to Plaintiff's Notice of Error, as required under Reg. X, 12 C.F.R. § 1024.35.  Count II contends that Defendant failed to conduct a reasonable search for information requested in Plaintiff's Requests for Information, as required by RESPA, Reg. X, 12 C.F.R. § 1024.36.  Defendant now argues that both of these claims are inadequately pled.

RESPA was enacted, in part, to ensure "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country."  12 U.S.C. § 2601(a).  It provides that borrowers may inquire about federally related mortgages by making a "qualified written request." 12 U.S.C. § 2605(e)(1)(A).  The term "qualified written request" is defined in 12 U.S.C. § 2605(e)(1)(B): it is a request that, *inter alia*, (a) describes why a borrower believes her "account is in error," or (b) "provides sufficient detail to the servicer regarding other information sought by the borrower."  Id.; see also Wenglicki v. Tribeca Lending Corp., No. Civ.A.07-4522, 2009

18

WL 2195221, at *4 n.7 (E.D. Pa. July 22, 2009).   The servicer is required to provide a written

acknowledgment of the request within five days, and must respond within thirty days. 12 U.S.C.

§ 2605(e)(2).  Additionally, § 2605(e)(2) requires servicers—"[n]ot later than 30 days . . . after

the receipt from any borrower of any qualified written request"—to

> (A) make appropriate corrections in the account of the borrower, including the
> crediting of any late charges or penalties, and transmit to the borrower a written
> notification of such correction (which shall include the name and telephone number
> of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes—
>
>> (i) to the extent applicable, a statement of the reasons for which the servicer
>> believes the account of the borrower is correct as determined by the servicer;
>> and
>>
>> (ii) the name and telephone number of an individual employed by, or
>> the office or department of, the servicer who can provide assistance
>> to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes—
>
>> (i) information requested by the borrower or an explanation of why
>> the information requested is unavailable or cannot be obtained by the
>> servicer; and
>>
>> (ii) the name and telephone number of an individual employed by, or
>> the office or department of, the servicer who can provide assistance
>> to the borrower.

Id. § 2605(e)(2)

    A plaintiff claiming a RESPA violation must allege not only a breach of a duty required

to be performed under RESPA, but must also show that the breach caused him to suffer damages.

Hutchinson v. Del. Sav. Bank FSB, 410 F. Supp. 2d 374, 383 (D.N.J. 2006) (citing 12 U.S.C. §

2605(f)(1)(A) ("Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure . . . [for] any actual damages to the borrower as a result of the failure . . . .")).  "Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence." Cortez v. Keystone Bank, Inc., No. Civ.A.98-2457, 2000 WL 536666, at *12 (E.D. Pa. May 2, 2000).  If a plaintiff prevails on a RESPA claim, he or she is entitled to "actual damages" from the RESPA violation.  12 U.S.C. § 2605(f)(1).

Notably, however, on January 10, 2014, a new regulatory regime went into effect through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.  Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank Act").  Pursuant to this Act, new regulations were promulgated entitled the "Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X)" and codified at 12 C.F.R. § 1024.  According to the Bureau of Consumer Financial Protection ("CFPB"),

> [T]his final rule implements Dodd-Frank Act sections addressing servicers' obligations to correct errors asserted by mortgage loan borrowers; to provide certain information requested by such borrowers; and to provide protections to such borrowers in connection with force-placed insurance.  Additionally, this final rule addresses servicers' obligations to establish reasonable policies and procedures to achieve certain delineated objectives; to provide information about mortgage loss mitigation options to delinquent borrowers; to establish policies and procedures for providing delinquent borrowers with continuity of contact with servicer personnel capable of performing certain functions; and to evaluate borrowers' applications for available loss mitigation options.  Further, this final rule modifies and streamlines certain existing servicing-related provisions of Regulation X.  For instance, this final rule revises provisions relating to mortgage servicers' obligation to provide disclosures to borrowers in connection with a transfer of mortgage servicing, and mortgage servicers' obligation to manage escrow accounts, including restrictions on purchasing force-placed insurance for certain borrowers with escrow accounts and

20

requirements to return amounts in an escrow account to a borrower upon payment in full of a mortgage loan.

78 Fed. Reg. 10,887 (Feb. 14, 2014).

The new regulation delineates separate procedures for responding to a borrower's Notice of Error and a borrower's Request for Information.  In the present case, Plaintiff focuses her RESPA claims on her Inquiry #4 to Defendant, which was sent on January 14, 2014,[2] and alleges that Inquiry #4 included both a Notice of Error and a Request for Information.  She further claims that the responses to both of these sections were noncompliant with Defendant's obligations under Regulation X.  The Court addresses each section of Inquiry #4 individually.

### 1. Notice of Error

With respect to a Notice of Error, a mortgage servicer must first, within five days of receipt of such a notice from a borrower, provide to the borrower a written response acknowledging such receipt.  12 C.F.R. § 1024.35(d).  Thereafter, the regulations provide, in pertinent part, as follows:

(e) Response to notice of error.

(1) Investigation and response requirements.

(i) In general.  Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written

---

[2] Notably, Inquiries #1, #2, and #3 all were made prior to the effective date of Regulation X and, therefore, would not be subject to its provisions.  Nonetheless, Plaintiff has not pled any violation resulting from Defendant's responses to those Inquiries.  Accordingly, the Court need not determine whether there was a RESPA violation in relation to Defendant's responses to those Inquiries.

notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

(ii) Different or additional error.  If during a reasonable investigation of a notice of error, a servicer concludes that errors occurred other than, or in addition to, the error or errors alleged by the borrower, the servicer shall correct all such additional errors and provide the borrower with a written notification that describes the errors the servicer identified, the action taken to correct the errors, the effective date of the correction, and contact information, including a telephone number, for further assistance.

. . .

(f) Alternative compliance.

(1) Early correction. A servicer is not required to comply with paragraphs (d) and (e) of this section if the servicer corrects the error or errors asserted by the borrower and notifies the borrower of that correction in writing within five days (excluding legal public holidays, Saturdays, and Sundays) of receiving the notice of error.

(2) Error asserted before foreclosure sale. A servicer is not required to comply with the requirements of paragraphs (d) and (e) of this section for errors asserted under paragraphs (b)(9) or (10) of this section if the servicer receives the applicable notice of an error seven or fewer days before a foreclosure sale.  For any such notice of error, a servicer shall make a good faith attempt to respond to the borrower, orally or in writing, and either correct the error or state the reason the servicer has determined that no error has occurred.

12 C.F.R. § 1024.35(e), (f).  Notably, a servicer need not comply with the requirements of this

22

section if any of the following circumstances exist: (1) the asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond pursuant to paragraphs (d) and (e) of this section, unless the borrower provides new and material information to support the asserted error; (2) the notice of error is overbroad and the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account; (3) the notice of error is delivered to the servicer more than one year after servicing or the mortgage loan was transferred or the loan was discharged.  12 C.F.R. § 1024.35(g)

In this case, Plaintiff asserts that her Notice of Error "covered Defendant's alleged failure to provide accurate information to Plaintiff regarding loss mitigation options and foreclosure; it included a complaint that Defendant was wrongfully proceeding to foreclosure sale without proper consideration of loan modification or other available loss mitigation options; and it claimed that Defendant was imposing delinquency and foreclosure fees or changes that it lacked a reasonable basis to impose upon Plaintiff's account."  (Compl. ¶ 88.)  She goes on to assert that Defendant did not conduct a "reasonable investigation" within the meaning of Reg. X, 12 C.F.R. § 1024.35(e) of these matters because "[h]ad any real investigation occurred," Defendant would have confirmed that Plaintiff was eligible for a loan modification, would not have erroneously entered judgment in the foreclosure action in violation of the "hold" order, would have considered possible loan modification, would not have given Plaintiff erroneous information about her supposed non-eligibility, and would not have imposed numerous delinquency and foreclosure charges on the Mortgage in violation of the NMS.  (Compl. ¶ 90.)  Further, Plaintiff contends that Defendant's January 24, 2014 response was noncompliant in that "it failed to

contain the required statement that no error had occurred; the stated 'true reason' for why

Plaintiff was not eligible for loan modification was false; [and] it failed to advise Plaintiff of her

right to request copies of all documents relied on in determining that no servicing error had

occurred, with instructions how to direct such a request."  (Id. ¶ 91.)

Defendant responds that Plaintiff's allegations do not rise to the level of a RESPA

violation because both the allegations of the Complaint and the exhibits attached to the

Complaint reflect that Defendant complied with its RESPA obligations.  Specifically, Defendant

responded to Inquiry #4 on January 24, 2014, stating as follows:

> Please be advised that the Trial Period Plan that you were approved for in 2009 was subsequently cancelled because you failed to make a payment in January 2010, which resulted in Bank of America sending you a decline letter dated May 6, 2010, a copy of which is enclosed.  In August 2010, you were approved for a Partial Payment Agreement, a copy of which is enclosed.  Although you were reviewed for a permanent Loan modification under the National Mortgage Settlement, this request was declined in July 2013 because you were not a borrower on the Loan and failed to qualify for assistance.  Enclosed are copies of the two decline letters that Bank of America sent to you on July 22, 2013.  Please be advised that the fact that you were not a borrower on the Loan was the true reason that your request was declined, and you will remain ineligible for a modification until you become a borrower.  Bank of America apologizes for any confusion that you may have experienced.
>
> Although you administer Damian Wilson's estate, that is not the same thing as assuming the Loan and becoming a borrower.  Please be advised that the Loan is currently due for the February 2009 installment and all installments due thereafter, and the Loan must be contractually current if you wish to qualify for an assumption. . . .
>
> Please be advised that Bank of America has requested that the servicing file be sent to you under separate cover.
>
> Enclosed is a Payment History that provides a detailed outline of transactions for the Loan during Bank of America's servicing.  Please note that this history provides pertinent information on payments received, tax and insurance payments disbursed, funds in the suspense/unapplied funds balance, and late charges assessed and paid. The Payment History is designed to be user-friendly and there are no codes or terms

used in the Payment History that require specific definitions.

The fees that have been charged to the account which are not reflected in the Payment History are as follows: return payments fees of $60.00; attorney/trustee fees of $2,926.98; property inspection fees of $812.50; title fees of $450.00; sheriff's fees of $5,000.00; filing fees of $79.68; mailing fees of $2.50; posting fees of $600.00; mortgage pay-by-telephone servicing fees of $30.00; and process server fees of $15.00.

Per the terms and conditions of the aforementioned documents, forced placed insurance, also known as lender secured insurance, can be secured by the lender if notification is received via property inspections that indicates the property as being vacant during the delinquency of the loan.  Lender secured insurance can also be placed if a borrower does not provide the lender with his preferred insurance information in a timely manner.

As of the date of this correspondence, no lender secured insurance has been purchased in connection with the Loan.

Pursuant to 15 U.S.C. § 1641(f)(2), the current owner of the note is Bank of America, N.A., which has an address of P.O. Box 5170, Simi Valley, CA 93062, Attention: Notice of Error/Request for Information, and which has a telephone number of (800) 669-6607.  Bank of America is the servicer of the Loan.

It is Bank of America's position that no further response to the Letter is required. The remaining requests and/or allegations contained in the Letter do not require a substantive response under 12 C.F.R. §§ 1024.3–10243.36 (and/or the exceptions articulated therein) or do not otherwise require a response under state or federal law.

Questions or concerns regarding the contents of this letter should be submitted to Bank of America in writing at P.O. Box 942019, Simi Valley, CA 93094-2019.  If you have other questions or concerns regarding the Loan, please contact Bank of America customer Relationship Manager Daniel Mack at (877) 471-4370.

. . .

(Compl., Ex. L.)  Defendant asserts that this letter demonstrates that, contrary to Plaintiff's

allegations, it conducted an investigation and concluded that no error had occurred.  Defendant

further asserts that simply because Defendant did not reach the same conclusions as Plaintiff in

conducting its review does not substantiate her claims that it failed to conduct a reasonable

investigation.  Moreover, Defendant's sending of the servicing file to Plaintiff provided a full explanation of any alleged error.

In support of its position, Defendant relies on several pre-Regulation X cases.  Prior to the enactment of Regulation X, courts held that "RESPA section 2605(e)(2)(B)(i) require[d] servicers to timely respond to borrowers' inquiries, and to provide 'a statement of the reasons for which the servicer believes the account of the borrower is correct.'  It [did] not impose any other substantive duties."  Starkey v. JP Morgan Chase Bank, N.A., No. Civ.A.13-694, 2013 WL 6669268, at *4 (S.D. Ohio Dec. 18, 2013), aff'd, ___ F. App'x ___ (6th Cir. 2014).  Thus, under the law, "RESPA [did] not impose a substantive duty on the servicer to correct Plaintiffs' account when the servicer . . . explained its reasonable belief that its position is correct."  Id.  In Vassalotti v. Wells Fargo Bank, N.A., 732 F. Supp. 2d 503 (E.D. Pa. 2010)—a case relied on heavily by Defendant—the plaintiff brought a claim pursuant to RESPA, prior to the enactment of Regulation X, alleging that the defendant, Wells Fargo, had failed to respond to her written notice of error and request for information.  Id. at 507.  Defendant moved to dismiss under Rule 12(b)(6), alleging that the plaintiff's allegations failed to state a claim upon which relief may be granted.  Id.  Upon reviewing the exchange of correspondence between plaintiff, the borrower, and defendant, the servicer, the Court concluded that:

> Wells Fargo complied with § 2605(e)(2)(B) by responding to Vassalotti's letters and informing her that, based on its review, the escrow shortage from the original mortgage agreement remained outstanding because Wells Fargo never capitalized her escrow deficit into the modified loan balance.  See Gruninger v. America's Servicing Co., No. 08–572, 2010 WL 653119, at *4–5 (E.D. Pa. Feb. 22, 2010).  Under RESPA, it is irrelevant whether the servicer's understanding of the loan modification agreement is correct, so long as it is reasonable.  Section 2605(e)(2)(B) requires only that the loan servicer provide "a statement of the reasons for which the servicer believes " . . . the accounting is correct.  A reasonable explanation of the servicer's

belief is sufficient, even if it is later determined that the belief is erroneous.

Wells Fargo's explanation is reasonable because there is an open question of contract interpretation with respect to whether the May 22, 2008 agreement capitalized the escrow deficit into the modified loan balance. . . . If Wells Fargo's interpretation of the contract is incorrect, as Vassalotti contends, that error is properly the subject of a breach of contract claim.  See Jones v. Select Portfolio Servicing, Inc., No. 08–972, 2008 WL 1820935, at *9 (E.D. Pa. Apr. 22, 2008) (plaintiff's assertion that the defendant's response was contrary to the terms of the agreement yields an action for breach of contract, not a violation of RESPA). Accordingly, I will grant Defendant's motion to dismiss Count I.

Id. at 509–10.

Although, at first blush, Starkey and Vassalotti would seem to suggest that Defendant has complied with its RESPA obligations, this conclusion ignores the impact of the subsequently enacted Regulation X.  As noted above, pre-Regulation X statutory language required nothing more than "an investigation" and a "written explanation" that the servicer believes supports its determination that the account is correct.  As such, the courts—including those in Vassalotti and Starkey—could correctly conclude that RESPA imposed mere procedural obligations to investigate and respond, without any substantive obligation to ensure that the investigation was reasonable and the response was thorough.  Regulation X, however, altered the landscape of those obligations.  For example, in response to a Notice of Error, a servicer must now conduct a "reasonable investigation."  The addition of the word "reasonable" seemingly imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons.  Although the case law is sparse given the relative novelty of these regulations, those courts interpreting Regulation X agree.  See, e.g., Friedman v. Maspeth Fed.  Loan and Sav. Ass'n, __ F. Supp. 2d __, 2014 WL 3473407, at *9 (E.D.N.Y. July 14, 2014) ("Defendant responds that it complied with RESPA when it conducted

27

an investigation, presented the requested information, and was not provided with the plaintiff's mail receipts in order to correct any errors. . . . Because plaintiff has now provided evidence plausibly demonstrating for purposes of pleading that defendant gave incorrect information, the complaint states a valid claim under RESPA."); Marais v. Chase Home Fin., LLC, ___ F. Supp. 2d ___, 2014 WL 2515474, at *9 (S.D. Ohio June 4, 2014) (holding that mere form response to Notice of Error and Request for Information did not satisfy RESPA's requirements). Moreover, the servicer must now provide the borrower "with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance." 12 C.F.R. § 1024.35(e)(1)(i)(A).

To that end, Plaintiff adequately pleads that Defendant has not complied with 12 C.F.R. § 1024.35(e). As noted above, Plaintiff's Complaint alleges that she was offered a TPP agreement under the HAMP program, pursuant to which she made payments and supplied documentation, but that the loan was never permanently modified. The Defendant then had her start a new agreement, but again never modified the loan and ultimately refused to deal with her until she individually assumed the loan, which she could not do with the loan being delinquent. Defendant thereafter sent her two letters with contradictory explanations for why her loan could not be modified. She then submitted her requests for information and Notice of Error, the responses to which were contradictory. Given the varying explanations Defendant offered for the treatment of the Loan account, Plaintiff now properly and adequately asserts that no "reasonable

28

investigation" has occurred with respect to her Notice of Error.[3]  (Compl. ¶ 90.)  Moreover,

Plaintiff has alleged that Defendant's response did not contain the required statements—new

obligations under Regulation X—that no error had occurred and that she was entitled to request

copies of all documents relied upon in determining that no servicing error had occurred.  (Id. ¶

91(citing 12 C.F.R. § 1024.35(e)(i)(B)).)  Taking Plaintiff's well-pled allegations as true—as the

Court must in the context of a Rule 12(b)(6) Motion—the Court finds that Plaintiff's RESPA

allegation with respect to her Notice of Error states a plausible claim for relief.

### 2.   Request for Information

With respect to Requests for Information, Regulation X provides that the servicer must

first acknowledge receipt of the request within five days.  12 C.F.R. § 1024.36(c).  Thereafter,

the regulation states:

(d) Response to information request.

(1) Investigation and response requirements. Except as provided in paragraphs (e) and (f) of this section, a servicer must respond to an information request by either:

(i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

(ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number,

---

[3]  Defendant argues that Plaintiff's allegation of lack of reasonable investigation is not plausible where it is contradicted by the documents attached to the Complaint.  The Court, however, cannot determine, based solely on the attached letters and in the absence of discovery, whether Defendant's investigation was "reasonable" for purposes of RESPA.

for further assistance.

. . .

(e) Alternative compliance. A servicer is not required to comply with paragraphs (c) and (d) of this section if the servicer provides the borrower with the information requested and contact information, including a telephone number, for further assistance in writing within five days (excluding legal public holidays, Saturdays, and Sundays) of receiving an information request.

(f) Requirements not applicable.

(1) In general. A servicer is not required to comply with the requirements of paragraphs (c) and (d) of this section if the servicer reasonably determines that any of the following apply:

(i) Duplicative information. The information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond pursuant to paragraphs (c) and (d) of this section.

(ii) Confidential, proprietary or privileged information. The information requested is confidential, proprietary or privileged.

(iii) Irrelevant information. The information requested is not directly related to the borrower's mortgage loan account.

(iv) Overbroad or unduly burdensome information request. The information request is overbroad or unduly burdensome. An information request is overbroad if a borrower requests that the servicer provide an unreasonable volume of documents or information to a borrower. An information request is unduly burdensome if a diligent servicer could not respond to the information request without either exceeding the maximum time limit permitted by paragraph (d)(2) of this section or incurring costs (or dedicating resources) that would be unreasonable in light of the circumstances. To the extent a servicer can reasonably identify a valid information request in a submission that is otherwise overbroad or unduly burdensome, the servicer shall comply with the requirements of paragraphs (c) and (d) of this section with respect to that requested information.

(v) Untimely information request.

12 C.F.R. § 1024.36.

In this case, Plaintiff has alleged, and Defendant does not dispute, that Defendant did not provide all of the information sought in the Request for Information, including copies of the servicing logs related to contacts between Plaintiff and Defendant or between Plaintiff and employees/representatives of Defendant, audio files of telephone calls with Plaintiff, documents submitted by Plaintiff in support of her request for loan modification, property inspection reports, and invoices from Defendant's foreclosure firm.  Defendant argues, however, that it properly asserted delineated exceptions to its obligations—i.e., that the request for materials was overbroad, unduly burdensome, and sought duplicative, confidential, proprietary, privileged, or irrelevant information—pursuant to 12 C.F.R. § 1024.36(f).  Having put forth such exceptions, Defendant asserts that it then bore no burden to search for materials and produce them or explain their unavailability.  (Def.'s Mot. Dismiss 8.)

Regulation X, however, changes the requirement imposed on the servicer from conducting just an "investigation" for the information to conducting a "a reasonable search for the requested information."  12 C.F.R. § 1024.36(d)(1)(ii).   Further, this regulation makes clear that a servicer's duty to comply with its response obligations are obviated only "if the servicer *reasonably* determines that" the documents meet any of the enumerated exceptions.  12 C.F.R. § 1024.36(f)(1) (emphasis added).  Plaintiff pleads that Defendant did not reasonably determine that the documents were in the excluded categories (unduly burdensome, overbroad, irrelevant, confidential, privileged, or proprietary), and that, in fact, many of the requested documents were available and were within the categories of documents that a servicer should provide.  (Compl. ¶

31

101.)  Taking such allegations as true, the Court again cannot dismiss this claim.

In short, the Court finds that Plaintiff's RESPA claims (Counts I and II) plead plausible

claims for relief.  While the law is clearly unsettled as to the scope of Defendant's duties under

12 U.S.C. § 2605 as amended by Regulation X, it appears that Regulation X requires more than

mere procedural compliance with the enumerated duties.  In light of the standard of review under

Rule 12(b)(6) and the well-pled allegations of Plaintiff's Complaint, the Court must deny

Defendant's Motion to Dismiss these claims.

### C.    Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim

Defendant next seeks dismissal of Plaintiff's claim for violation of the Pennsylvania

Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  The UTPCPL prohibits

"[u]nfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. §

201–3.  The statute prohibits, in the catchall provision, "fraudulent or deceptive conduct which

creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce.

73 Pa. Stat. § 201–2(4)(xxi).  To state a plausible claim under the UTPCPL, the Complaint must

allege that: "(1) [Plaintiff] purchased or leased goods or services primarily for a personal, family,

or household purpose; (2) [Plaintiff] suffered an ascertainable loss of money or property; and (3)

the loss occurred as a result of the use or employment by a person of a method, act, or practice

declared unlawful by the UTPCPL."  Baynes v. George E. Mason Funeral Home, Inc., No.

Civ.A.09–153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. §

201–9.2(a)).  The Complaint must also allege that Plaintiff justifiably relied on the deceptive

conduct.  See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (concluding that

"plaintiffs alleging deceptive conduct under the . . . catchall provision must allege justifiable

reliance").  In other words, the Complaint must allege that knowledge of the deceptive conduct

"would have changed [Plaintiff's] conduct."  Id. at 227.  "[T]he UTPCPL is to be liberally

construed to effectuate its objective of protecting the consumers of this Commonwealth from

fraud and unfair or deceptive business practices."  Ash v. Cont'l Ins. Co., 932 A.2d 877, 881 (Pa.

2007).

Plaintiff's Complaint asserts that, notwithstanding Defendant's representation to the

United States Treasury and the American public that it would comply with HAMP guidelines and

offer loan modifications to eligible borrowers, Defendant engaged in deceptive conduct in its

dealings with Plaintiff about the Property, which created the likelihood of confusion or

misunderstanding regarding her right to a loan modification.  (Compl. ¶¶ 109–10.)  This conduct,

according to Plaintiff, included the following:

a.  After entering into an agreement with Plaintiff to modify the Mortgage under
the HAMP program, and, as a part of that agreement, inducing Plaintiff to
make TPP payments, Defendant failed to modify the Mortgage as it
represented it would and as it was required to do under the HAMP program
once Plaintiff made the last of her three required TPP payments in December,
2009;

b.  After Plaintiff had complied with her TPP obligations and provided all the
documentation Defendant had requested, Defendant strung her along,
inducing her to continue making additional TPP payments, by, among other
things, thanking her in March 2010 for her cooperation in fulfilling her
HAMP obligations but asking for more current financial documentation;

c.  Representing to her, in May 2010 and without factual basis, after she had sent
in all the requested documentation and made every payment, that she was
suddenly ineligible for HAMP based on the sole reason of "not making all the
required Trial Period Plan payments."

d.  After the intervention of Plaintiff's housing counselor, resuming its
acceptance of monthly payments at a slightly higher amount, and having her
sign a second payment agreement ("Partial Payment Agreement") that, among

other things, promised a modification decision by December 1, 2010, but failed to explain the connection, if any, between this new writing and the earlier HAMP agreement;

e.  Stringing her along further by thanking Plaintiff in November 2010 for successfully completing her "Special Forbearance Plan," and promising, finally, to "review your loan for modification," but not doing so and not telling her why;

f.  Failing to conduct the promised second review of the account for loan modification but continuing to accept Plaintiff's $700/month payments until inexplicably refusing to accept any further payments in April 2011 and suddenly refusing to communicate with her based on her not being the original mortgagor;

g.  Failing to comply with its obligations under the National Mortgage Settlement with respect to the Mortgage, and, instead, entering a default judgment in the foreclosure action, without prior notice to Plaintiff, without offering her loss mitigation options and without seeking to lift the "hold" that had been placed on the foreclosure by agreement between Plaintiff and Defendant, as approved by the state court;

h.  Representing to her in separate letters sent to her on the same date (July 22, 2013) that her loan had not be[en] modified because she had purportedly withdrawn her request for a loan modification while, in the other, stating that she was not eligible for a modification "because the person who requested the loan modification is not a borrower on the mortgage loan."  Besides the fact that these letters contradicted each other, they were both independently false and misleading in that Plaintiff had never withdrawn her request for a loan modifications and HAMP specifically requires participating servicers to accept HAMP applications from the heirs of deceased mortgagors and to evaluate such applications as if the heir herself was the mortgagor;

i.  After receiving several formal written inquiries from Plaintiff under RESPA, compounding its contradictory, confusing and erroneous representations about the reasons or not modifying her loan by (i) first responding, on October 8, 2013 that the reasons she was not approved for a loan modification were that she failed to make her required payments under the 2009 TPP agreement and then had "declined" a subsequent, but unidentified, second offer of a TPP and that the letter telling her that her status as an heir to the original mortgagor made her ineligible had been sent in error and then, (ii) on January 24, 2014, telling her the opposite, that the "true reason" her loan was not modified was that "you remain ineligible for a modification

until you become a borrower" by bringing the account current and then requesting the assumption.

(Id. ¶ 110.)  Moreover, Plaintiff contends that Defendant engaged in fraudulent or deceptive conduct by churning the Mortgage for fees or charges not reasonable or otherwise proper, or by allowing others to do so.  (Id. ¶ 112.)

Defendant now argues that a UTPCPL claim based upon alleged HAMP violations fails because HAMP violations do not give rise to a private cause of action.  (See Def.'s Mem. Supp. Mot. Dismiss 9 (citing multiple cases).)[4]  Stated differently, Defendant asserts that Plaintiff's UTPCPL claim should be dismissed as a back door effort to enforce compliance with HAMP, which does not provide a private cause of action.

While the Court acknowledges the well-settled law that HAMP has no private right of

---

[4] Defendant cites the following cases:  Kim v. Bank of Am., N.A., No. Civ.A.11-296, 2011 WL 3563325, at *3 (W.D. Wash. Aug. 11, 2011) (holding that HAMP does not recognize a private right of action against lenders or servicers) (further citations omitted); Stolba v. Wells Fargo, No. Civ.A.10-6014, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011) (noting that HAMP does not create a private right of action for borrowers) (further citations omitted); Coulibaly v. J.P. Morgan Chase Bank, N.A., No. Civ.A.10-3517, 2011 WL 3476994 (D. Md. Aug. 8, 2011) (finding no private cause of action under HAMP) (further citations omitted); Sherman v. Litton Loan Serv., L.P., No. Civ.A.10-567, 2011 WL 2634097, at *12 (E.D. Va. July 1, 2011) ("[T]o the extent plaintiff's complaint implicates HAMP, it must be dismissed due to the lack of any private right of action thereunder."); Wigod v. Wells Fargo Bank, N.A., No. Civ.A.10-2348, 2011 WL 250501, at *4 (N.D. Ill. Jan. 25, 2011) (no private right of action under HAMP) (further citations omitted); Marks v. Bank of Am., N.A., No. Civ.A.10-8039, 2010 WL 2572988, at *2–4 (D. Ariz. June 22, 2010) ("Under the HAMP, a qualified borrower would not be reasonable in relying on an agreement between a participating servicer and the U.S. Department of Treasury as manifesting an intention to confer a right on the borrower because the agreement does not require that the participating servicer modify eligible loans."); Simmons v. Countrywide Home Loans, Inc., No. Civ.A.0-1245, 2010 WL 2635220, at *5 (S.D. Cal. June 29, 2010) ("Qualified borrowers such as plaintiffs here cannot reasonably rely on a manifested intent to confer rights upon them since the [HAMP] Agreement does not require that [servicers] modify all eligible loans."); Adams v. U.S. Bank, No. Civ.A.10-10567, 2010 WL 2670702, at *4 (E.D. Mich. July 1, 2010) ("[H]omeowners do not have a right to a loan modification under HAMP.").

action, the Court disagrees with Defendant's conclusion that a claim under the UTPCPL is therefore precluded.  This "back door" or "end-run" theory is "built on the novel assumption that where Congress does not create a private right of action for violation of a federal law, no right of action may exist under state law, either."  Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 581 (7th Cir. 2012).  As noted by the Seventh Circuit, however, "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law."  Id.  The court found that the plaintiff's state law claims against the defendant for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) did not constitute an improper "end–run" around the lack of private action under HAMP, where claims did not allege that the servicer engaged in unfair or deceptive business practices by violating HAMP guidelines, but instead focused on the servicer's misrepresentation and omission of material facts, how those actions misled her to believe she would receive permanent loan modification under HAMP, and that the servicer implemented HAMP compliance procedures so as to thwart the plaintiff's legitimate expectations.  Id. at 585.

Similarly, in Cave v. Saxon Mortgage Services, Inc., No. Civ.A.12-5366, 2013 WL 1915660 (E.D. Pa. May 9, 2013), the court declined to dismiss the UTPCPL claim.  In that case, the plaintiffs asserted, among other claims, a UTPCPL cause of action against the defendant mortgage servicer based on the defendant's failure to permanently modify home mortgage loans after providing homeowners with temporary modifications.  Id. at *1.  The complaint alleged that defendant "'strung [Plaintiffs] along in an extended trial period and instructed [them] to continue to mak[e] modified payments' even though their temporary trial periods had ended and they were

entitled to permanent modifications." Id. at *10.  It further alleged that during this time, the

defendant provided the plaintiffs with "erroneous and misleading information" about their

mortgages, "failed to provide [one plaintiff] any guidance whatsoever" about his mortgage, and

"failed to cooperate with [another plaintiff] with respect to her application for a [Homeowners

Emergency Mortgage Assistance Program] loan." Id.  The defendant argued that these

allegations did not constitute deceptive conduct because they were based on the defendant's

alleged failure to perform its contractual obligations under the TPP, and a failure to perform

under a contract is not actionable deceptive conduct under the UTPCPL. Id.  The court found,

however, that the defendant's representations to plaintiffs after their TPP trial periods ended, in

assuring them that they were still in trial periods and giving them erroneous and misleading

information about their mortgages, "were made separate and apart from any of the defendant's

obligations under the TPPs." Id.  Further, it determined that the complaint's allegations that the

defendant failed to provide one plaintiff with accurate information about his mortgage was

wholly unrelated to contractual obligations under the TPPs. Id.; see also Seldon v. Home Loan

Servs., Inc., 647 F. Supp. 2d 451, 471 (E.D. Pa. 2009) (declining to dismiss UTPCPL claim on

the grounds that plaintiffs have alleged a viable claim on the basis of misrepresentations

involving the repayment plan; "[t]aking all reasonable inferences in plaintiffs' favor, the court

finds that given the dire financial circumstances that allegedly drove plaintiffs to enter the

repayment plan, plaintiffs relied on defendants' representation that payments under the plan

would remain at $700.").

     In the instant matter, many of Plaintiff's allegations in Count III rest the UTPCPL claim

on Defendant's alleged failure to comply with its obligations under HAMP.  (See, e.g., Compl. ¶

110(g).)  To the extent the Complaint does so, Plaintiff is barred from bringing such a claim.  To the extent, however, that Plaintiff alleges that Defendant falsely induced her to make TPP payments under the promise of loan modification, strung her along and induced her into making additional TPP payments under false pretenses, falsely induced her into a second partial payment agreement on the promise of a loan modification with no intention of following through on any loan modification before foreclosing, misrepresented to her the status of her mortgage and whether or not she was eligible to seek loan modification, and added improper fees and charges to the mortgage, these misleading actions are separate and apart from Defendant's obligations under the TPPs and HAMP.  Such allegations suggest that Defendant engaged in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding.  Thereafter, Plaintiff asserts that "[b]ut for this deceptive conduct by Defendant, Plaintiff would have foregone investing her own funds in saving the Property from foreclosure, which she did under the reasonable belief that the Mortgage would be modified in accordance with BOA's representations to her and to the Treasury Department, if she followed [Defendant's] instructions and did what she was asked to do."  (Compl. ¶ 111.)  Taking all inferences in the light most favorable to Plaintiff, the Court therefore declines to dismiss this claim.

**D.**     **Breach of Contract**

The next claim at issue is Plaintiff's cause of action for breach of contract.  The Complaint alleges simply:

> 116.   The July 2009 HAMP TPP agreement constituted a contract to permanently modify the Mortgage in accordance with HAMP guidelines on the condition that Plaintiff made her TPP payments and continued to provide current financial documentation confirming her continuing eligibility for HAMP.

117.    Plaintiff complied with her obligations under the contract.

118.    Defendant breached the contract.

119.    As a proximate result of that breach, Plaintiff suffered economic harm in excess of $44,000.

(Compl. ¶¶ 115–19.)  Defendant now again alleges that HAMP does not create a private right of action and that a breach of contract claim based on a HAMP TPP agreement is simply an alternative way of bringing such a private right of action.

"The question of whether [a] TPP that was sent to [a borrower] created an enforceable contract for a permanent loan modification [has] been the subject of much litigation among multiple jurisdictions."  Laughlin v. Bank of Am., N.A., No .Civ.A.13-4414, 2014 WL 2602260, at *6 (D.N.J. June 11, 2014).  Several courts have found that the TPP does create an enforceable agreement to, at minimum, offer a permanent loan modification, at least for purposes of a surviving a motion to dismiss under Rule 12(b)(6).  Id. (citing Corvello v. Wells Fargo Bank, 728 F.3d 878, 883–85 (9th Cir. 2013) (holding that the "natural and fair interpretation of the TPP" is that the servicer must send a modification agreement "offering to modify the loan once borrowers meet their end of the bargain"); Wigod v. Wells Fargo Bank, 673 F.3d 547, 563 (7th Cir. 2012) (holding that the TPP was an offer to provide a permanent modification agreement if borrower fulfilled necessary conditions); Alimena v. Vericrest Fin., Inc., 964 F. Supp. 2d 1200, 1216–17 (E.D. Cal. Aug.9, 2013) ("[A]ssuming the borrower satisfies the requirements therein, the TPP constitutes an enforceable agreement to permanently modify a mortgage."); Lazo v. Bank of Am., No. Civ.A.12–0762, 2012 WL 1831577, at *6 (N.D. Cal. May 18, 2012) (stating that once plaintiff made its three required payments, the terms of the TPP required Bank of America to

provide a loan modification offer); Cave v. Saxon Mortgage Servs., Inc., No. Civ.A.12–5366, 2013 WL 1915660, *4–6 (E.D. Pa. May 9, 2013) (breach of contract claim sufficient at pleadings stage); Cave v. Saxon Mortgage Servs., Inc., No. Civ.A.11–4586, 2012 WL 1957588, at *5–6 (E.D. Pa. May 30, 2012) (concluding that the TPP contained a clear promise to provide the borrowers with a permanent modification if several conditions were met); Bosque v. Wells Fargo Bank, 762 F. Supp. 2d 342, 351–52 (D. Mass. 2011) (finding plaintiffs sufficiently alleged a breach of contract claim).

On the other hand, "[o]ther courts, after reviewing the language in the TPP, have found that it is simply one step in the application process towards a permanent modification, and therefore cannot form the basis for a breach of contract claim because there was no guarantee of a permanent modification.  Courts have also dismissed these claims based upon a failure to allege that all the necessary conditions precedent have been met." Laughlin, 2014 WL 2602260, at *6–7 (quoting Reitz v. Nationstar Mortg., LLC, 954 F. Supp. 2d 870, 885–88 (E.D. Mo. 2013) (holding that the TPP was not a valid enforceable contract that required a permanent mortgage modification); Pandit v. Saxon Mortg. Servs., No. Civ.A.11–3935, 2012 WL 4174888, at *5 (E.D.N.Y. Sept. 17, 2012) (finding, based upon the language in the entire TPP, that the TPP "was but one step on the road towards modification"); Lucia v. Wells Fargo Bank, 798 F. Supp. 2d 1059, 1066–68 (N.D. Cal. 2011) (dismissing breach of contract claim under Rule 12(b)(6) on the basis that TPP did not give rise to enforceable contract because the plaintiffs had not alleged that they had received a modification agreement, as required under Section 2 of the TPP); Stolba v. Wells Fargo, No. Civ.A.10–6014, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011) (finding that the language of the TPP made clear that satisfying the conditions in the TPP did not guarantee a

permanent modification); Bourdelais v. J.P. Morgan Chase, No. Civ.A.10–670, 2011 WL 1306311, at *4–5 (E.D. Va. Apr. 1, 2011) (finding plaintiffs failed to state a claim because they failed to allege that they qualified for a permanent modification or that they received a copy of an executed copy of the permanent modification as required as a condition under the TPP); Lonberg v. Freddie Mac, 776 F. Supp. 2d 1202, 1209 (D. Or. 2011) (finding that, because plaintiff failed to allege that the defendant determined the plaintiff met the requirements of the TPP or that the defendant sent the plaintiff a loan modification executed by both parties, no binding contract had been alleged).

While the Third Circuit has yet to opine on this issue, at least one court in this circuit has reached the question and declined to dismiss the breach of contract claim.  In Cave v. Saxon Mortg. Services, Inc., No. Civ.A.12-5366, 2013 WL 1915660 (E.D. Pa. May 9, 2013), the complaint alleged that the defendant breached its TPPs with the plaintiffs by failing to offer them permanent modifications after they complied with their obligations under the TPP.  Id. at *4. The defendant mortgage servicer argued that HAMP does not provide for a private right of action.  Id. at *4 n.3.  The court dismissed this argument, stating, "Plaintiffs, however, have not brought a claim under HAMP, but rather are trying to enforce the terms of the TPP.  In these circumstances, it is inconsequential that HAMP affords no private right of action."  Id.  The court found the breach of contract claim valid, remarking that "the TPP obligated [the defendant], after it returned the executed TPPs to Plaintiffs, to provide Plaintiffs with permanent modifications as long as they 'compl[ied] with the requirements in Section 2 and [their] representations in Section 1 continue[d] to be true in all material respects'—in other words, as long as they made all of their trial payments on time and their financial information continued to be true and accurate."  Id. at

*6.  The court therefore concluded that the complaint plausibly alleged that plaintiffs were qualified for permanent modification.  Id.

In the present case, the Complaint alleges that "the July 2009 HAMP TPP agreement constituted a contract to permanently modify the Mortgage in accordance with HAMP guidelines on the condition that Plaintiff made her TPP payments and continued to provide current financial documentation confirming her continuing eligibility for HAMP."  (Compl. ¶ 116.)  This allegation is bolstered by a copy of the Agreement, attached as Exhibit A, which states, "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer *will provide* me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  (Compl., Ex. A (emphasis added).)  Plaintiff then adequately alleges that she complied with her obligations under the contract, but Defendant nonetheless breached its obligations by not providing her with a Home Affordable Modification Agreement.  (Compl. ¶¶ 44–47, 116–17.)  Given the affirmative promise by Defendant to provide Plaintiff with an Modification Agreement upon satisfaction of her obligations, the Court finds that the TPP constituted a binding contract upon which Plaintiff can rest a viable breach of contract claim. Accordingly, the Motion to Dismiss this claim is denied.[5]

---

[5]  Defendant also argues that Plaintiff cannot maintain her breach of contract claim because there is no HAMP guideline authorizing the permanent modification of a loan held by an estate.  Defendant, however, cites to no law affirmatively stating that the personal representative of an estate cannot step into the shoes of the original borrower for purposes of a loan modification.

E.      **Promissory Estoppel/Detrimental Reliance Claim**

The final claim at issue is Plaintiff's Count V for Promissory Estoppel/Detrimental

Reliance.  This claim alleges the following:

> 121.    The 2009 TPP agreement was a promise by BOA to Plaintiff that it would
> cancel the foreclosure and modify the loan pursuant to the HAMP program if
> Plaintiff made the required trial period payments and provided BOA the
> documentation it needed to confirm her eligibility for a loan modification under
> HAMP.

> 122.    In making that promise, BOA reasonably expected or should have reasonably
> expected Plaintiff to make the requested payments and to incur reasonable expenses
> necessary to maintain the property.

> 123.    BOA effectively renewed that promise in the "Partial Payment Agreement"
> it had Plaintiff execute, insofar as it promised that BOA would decide whether it was
> going to modify the loan by December 2010.

> 124.    Plaintiff reasonably expected that, in conducting the promised review, BOA
> would follow the HAMP guidelines as it had promised the United States Treasury
> Department it would do.

> 125.    BOA's promises did in fact induce Plaintiff to spend money, trying to save
> the Property from foreclosure, to wit the economic damages in excess of $44,000.

> 126.    BOA's promises should be enforced to prevent injustice to Plaintiff.

(Compl. ¶¶ 122-26.)  Defendant now argues that because this claim is based upon an allegedly

enforceable contract, it must be dismissed.

An action based on unjust enrichment is an equitable action which sounds in

quasi-contract, a contract implied in law.  Sevast v. Kakouras, 915 A.2d 1147, 1153 n.7 (Pa.

2007).  A plaintiff who claims unjust enrichment must "'show that the party against whom

recovery is sought either wrongfully secured or passively received a benefit that would be

unconscionable for the party to retain without compensating the provider.'"  Bair v. Purcell, 500

43

F. Supp. 2d 468, 499 (M.D. Pa. 2007) (quoting Hershey Foods Corp. v. Ralph Chapek, Inc., 828

F.2d 989, 999 (3d Cir. 1987)).   Under Pennsylvania law, the elements of a claim for unjust

enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of

such a benefit by the defendant; and (3) the defendant accepted and retained such benefit under

circumstances where it would be inequitable for the defendant to retain the benefit without

payment of value.  Global Ground Support, LLC v. Glazer Enter., Inc., 581 F. Supp. 2d 669, 675

(E.D. Pa. 2008).

  Nonetheless, it is a well-established rule that the doctrine of unjust enrichment is

inapplicable when the relationship between the parties is founded upon written agreements, no

matter how "harsh the provisions of such contracts may seem in the light of subsequent

happenings." Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006) (quotations

omitted). As previously noted by this Court:

> [This] bright-line rule also has deep roots in the classical liberal theory of contract.
> It embodies the principle that parties in contractual privity . . . are not entitled to the
> remedies available under a judicially-imposed quasi-contract because the terms of
> their agreement (express or implied) define their respective rights, duties, and
> expectations.

Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 620–21 (E.D. Pa. 2003).

  In the present case, the Court has found that a valid and enforceable contract exists

between the parties.  As the finding of valid contract precludes a claim for promissory estoppel or

detrimental reliance, the Court dismisses this claim.

## IV. CONCLUSION

  In light of the foregoing, the Court dismisses Plaintiff's Complaint to the extent it alleges

any claims in her individual capacity and to the extent it seeks relief under a theory of promissory

estoppel/detrimental reliance.  The Court finds, however, that Plaintiff has properly pled her claims for violations of RESPA (Counts I and II), her claim under UTPCPL (Count III), and her breach of contract claim (Count IV).  Accordingly, Defendant's Motion to Dismiss these claims is denied.

An appropriate Order follows.